Good morning, your honors. I'm Robert Long, representing Wells Fargo Bank. I'd like to reserve five minutes for rebuttal. This case concerns the order in which a national bank posts transactions to customer accounts. The district court held that California law prohibits the bank from posting debit card transactions in high to low order. The judgment should be reversed for two main reasons. First, plaintiff's claims are preempted by federal banking law. And second, plaintiff's claims fail as a matter of state law. As to preemption, state laws that prevent or significantly interfere with the exercise of national bank powers under federal law are preempted. Posting transactions to customer accounts is a federal banking power. It's incidental to the power to receive deposits. It's also part of the power to establish fees and to determine a method for calculating fees. And the OCC has so determined in a number of OCC letters, so we are definitely dealing with national bank powers in this case. And so the question for preemption purposes is whether the application of the state law, as interpreted by the district court here, significantly interferes with that federal power to post transactions to customer accounts. And the answer to that question is yes. As the Supreme Court said in the Waters case, state law may not curtail or hinder a national bank's exercise of any federal banking power. So here the effect of the district court's decision is that the bank may not post in high to low order. It can still post transactions. There are some other posting orders that it can select. But in the national banking area, that's not enough to avoid preemption because of the history of national banks. And this goes all the way back to the Bank of the United States and the original banks. Any state law that significantly interferes with the exercise of the federal power is preempted. So for example Let me ask you a question in kind of an abstract form, and I don't know whether it will get us forward or not. There are various forms of preemption, express preemption, implied preemption, inconsistent preemption, field preemption. What kind of preemption are we talking about? Conflict preemption. Conflict preemption. And for conflict preemption, how explicit does the federal law have to be in order to support conflict preemption? Well, again, as the Supreme Court said in Barnett Bank and Waters, for the particular kind of conflict preemption for national banks, the analysis is, first, are we dealing with a national bank power? Here we are, the power to post transactions. And then the question is simply, does the state law prevent or significantly interfere with the exercise of that power? And if it does, it's preempted. So there's no That's stated in such a general way. That sounds more like field preemption in the sense that you're not stating any particular command of federal law with which the state law is inconsistent or in conflict. Do you have anything that says from the federal law, here's what the state may not do? Well, yes. In fact, we do. I mean, we've got OCC regulations here, which the OCC recently reconfirmed. There's 12 CFR 7.4007, and that's a regulation that lists certain types of state laws that are preempted if they have to do with taking deposits. And two of the types of state laws that are preempted are laws concerning checking accounts and laws concerning disclosure requirements. So as this Court held in the Martinez case, interpreting a parallel OCC regulation with a parallel structure, state laws that fall into those categories are preempted. And on your question, Your Honor, about how do we figure out the difference between conflict preemption and field preemption in this special area, the OCC recently revised these rules in the wake of Dodd-Frank. So the revisions wouldn't actually apply to this case, but they reaffirmed the rules, and they have a discussion of exactly the question you raised of why is this looks sort of like field preemption. This is 76 Federal Register 43,556. They basically are explaining why they have this rule, 7.4007, that says these categories of law are preempted. And they say that the regulation identifies categories and or terms of state laws that are preempted. The regulations were based on the OCC's conclusions that the listed types and terms of state laws would be preempted by application of the conflict preemption standard of the Barnett decision, where the same type of impediment exists under multiple states' laws. A single conclusion of preemption can apply to multiple laws. And then skipping down, the types and terms of laws that are set out in the 2004 preemption rules, those are the rules we're talking about here, were based on the OCC's experience of the potential impact of such laws on national banks. And that's so high-level abstract, it's a little hard to understand exactly what's meant. Let me ask the following question that is not precisely what happened here. But let's assume that we have a bank that is charged under state law with committing fraud. And the fraud that's charged and proven, again, this is not this case, is that for every deposit in which $100 is put in, the bank credits 99, having promised the consumer that it will always credit the amount put in. That's just outright fraud. Is that state law prohibiting fraud preempted? I think that kind of state law could apply. The example I have, I think it's parallel to yours, but be sure it is, is closer to our case. If the bank said, we are going to post transactions in low-to-high order, and then they didn't do it. They did something else. They posted it in high-to-low order. So the fraud is not preempted. Well, in general, but I have to be careful, Your Honor, because if a State could get around this strict limitation on State regulation of national banks simply by saying, well, we're not having a specific code of banking here. We're just having some general rules that say you have to operate in good faith and have good business practices and not do anything that's unfair. And we'll work that out case by case. We'll let individual courts and juries decide what's fair. You could end up. Yeah, but that's not where my question is going. The district court found a species of fraud. That is to say, the district court found that the representations to the consumer were made in such a fashion that when the bank says buried in the fine print, and I'm just kind of trying to recapitulate what the district court said, buried in the fine print, the bank says we may order these high-to-low, when the bank not may had already decided and was doing, that the district court found that was fraud. Now, whether that's right or wrong, once the district court finds that that's fraud, I'm not sure I heard you say that that's preempted. You may say that it's not fraud. Well, let me try to answer your question again specifically with respect to fraud. In the fraud area, you're absolutely right. There's a Section 17200 fraud claim here. There's also, under the Franklin National Bank case of the Supreme Court, under the OCC regulations that we're discussing, which also cover disclosure requirements under this Court's decision in Rose, we the National Bank's powers include the power to make disclosures, and state laws that significantly interfere with that incidental power are also preempted. So, for example, in Franklin National Bank, the State of New York had a, I think, a reasonable position. They said, we have special savings banks in New York, and it's confusing. It's, if you will, it's a something verging on fraud for a national bank to say that they offer savings accounts, because the State of New York reserved that word for a special kind of financial institution. And the Supreme Court held, this is a national bank, and because we have this special approach in the world of national banks that they exercise their Federal powers without significant interference from State law, even if a State wants to put a label on it of fraud, it's still going to be preempted. But, you know, may I just take that a little further? It seems to me in the preemption area that the answer always depends on how you frame the question, particularly in this kind of preemption. So if we take as a given that a State might, through unfair competition or even common law fraud, be able to have those laws exercised against a bank, my question is to what degree of specificity, because in the case you're talking about, I think, with Franklin Bank, I could, it makes perfect sense that that would have been preempted. Here we have kind of an odd situation where the OCC regs basically give authority to do the high to low. Well, we also have interpretive letters that say, but be careful, banks, because unfair competition laws are among the kind of laws that may come back to bite you. So there is some tension even in the OCC construct, and I would appreciate your comment on that, and then also your comment with respect to the specific regulation that mentions high to low, whether it matters if we interpret that as, you know, an express authority or just discretionary authority. Well, on your question, your first point, it matters how you frame the question. I think the Supreme Court has said how to frame all of these national bank preemption issues. First, is there a national banking power that's at issue? And the answer here is yes. And second, is it prevented, does it prevent or significantly interfere? Well, that's where you get in terms of how you look at significant interference, because if you have this, it gives me pause here, because you have this specific regulation that really looks at high to low. It's not – I would have less concern if you were just relying solely on the fact that you're able to take deposits, for example, which is a broad banking authority. That seems to me to be something that in its broad sense is not necessarily preempted by general state unfair competition laws. But as you get narrower and it says, yes, you – not only that, but you actually have this specific authority of high to low, now we're getting into a fairly directive or permissive State law.  On your question about whether there seems to be tension in the OCC's statements, I mean, what I would say is in the letters where they say very clearly that banks are authorized to post high to low, they say, no, we're not commenting on whether State law is preempted, and that's because they weren't asked to. But again, if you apply this analysis, they're saying, yes, this is your Federal banking power to post at any order, including high to low, and therefore, it becomes a question of significant interference. And if you look at the cases, I mean, taking away a major posting order really is a significant interference. Let me ask you this. If you have this authority to do it high to low, what if you don't tell the customer at all? Would, in your view, that be a claim that could be brought under State law? Well, if there was no disclosure at all, so that's now where we have to keep separate. We have the question about the posting order itself, which is, to my way of thinking, is as central to the business of banking as anything. So if anything is preempted, the choice of an order to actually post transactions to customer accounts is preempted. Then when you go to not, so that would be complete nondisclosure. So they haven't said anything.  I'm taking it clear over here. It's a complete nondisclosure. Sure. So they haven't said anything false, but they just haven't said anything. Correct. I mean, I think, again, looking at this 7.4007, I mean, since we're clearly in the area of checking accounts and disclosure requirements, I would say that's a problem if the bank makes no disclosures at all. Problem in what sense? But there's Federal law. I mean, the Federal regulators would step in. Well, but that's so preempted or not. You can have dual. You can have Federal regulators and you can have a State law private claim. So I guess you haven't really answered my question is, in your view, if there's no disclosure and the lawsuit brought by a set of plaintiffs is under State, under competition law, is there still preemption in that circumstance? I think my general answer would be that, you know, that would be a matter for the Federal regulators applying Federal law. So I guess your answer is yes, it's preempted. It's preempted because there's a Federal regulatory structure? Because it would be a disclosure requirement. It would be State law saying to the National Bank, you have to have more disclosures about this. And, again, I mean, it's a very common concept to say, well, of course we have dual regulation of almost everything. Businesses have to comply with Federal law and State law. But in this area of National Bank preemption, not for everything banks do, but for the exercise of their Federal powers, because of the history and how the National Banks were started and the hostility from the State banks, we have this tradition that it's regulated by Federal law. So, for example, just so I understand your position, as you know, Nevada has a statute that specifies posting. And I know that case isn't in front of us, but do you believe that statute is preempted? I'm sorry, I didn't get that. I'm talking about the Nevada statute about posting. Yes. Do you believe that statute is preempted? I think it would be. I mean, the Wells Fargo Bank has chosen to live with that statute. That's something that happens pretty commonly. So Wells Fargo's position is we don't have to abide by Nevada law, but we choose to treat our Nevada customers differently from our California customers. Well, and that's often done. I mean, it's hard to see how that furthers a national purpose. But one of the big points of the Federal banking law is to allow National Banks to have uniformity. If there is no preemption here, of course, I don't know. Have the Feds done anything to indicate their disapproval of the Nevada law that requires a certain order of posting? Is there anything? Have the Feds done anything to indicate their disapproval of Nevada law that requires a certain order of posting? Well, yes, there are these OCC letters, which we cite in our... And have they specifically addressed Nevada? No, they address high-to-low posting, and they say that National Banks are authorized to post high-to-low. And as I say, when you look at that... And has any bank challenged the Nevada law? Not to my knowledge. Okay. Could you address one other thing, and that is how various of these permissive authorities under the regulations fit together? One of the specific authorities, as I understand it, is that the bank is given authority to determine the method of calculating overdrafts, correct? Yes, that's right. So then the question becomes, and it's given the authority to go high-to-low... Right. ...in a specific regulation. But is a bank's determination, then, of how it puts those together, and in this case results in, as documented here, multiple overdrafts for a small number of transactions, how does that relate to the first two sets of authority that I referenced? That's, if you look in 7.4002, which is another one of the OCC regulations that's at issue, the OCC says banks, national banks, are to make this determination by considering safe and sound banking principles, and they list four of them. And so that is the way, under federal law, that national banks are to make that choice. And, I mean, I sense some reluctance to embrace this. And I think, frankly, after reading the district court's decision, the court would be reluctant to say, well, to endorse high-to-low posting. But I want to be clear, we're not asking for that. I mean, we think the key question here is who gets to make the choice whether high-to-low posting should be allowed for national banks. And our position is it's the federal regulators. And the fact is the federal regulators have to decide. But there's a different question here. Even if high-to-low posting is authorized by federal law and Wells Fargo is therefore permitted to do high-to-low posting, there's an additional question in this case, and that is were the consumers misled? Absolutely. And so you're saying the federal law says that we get to do high-to-low posting and we can mislead the consumers? I don't think you want to say that. Well, I mean, we have two arguments, Your Honor. I mean, one is, yes, indeed, there are, there is federal preemption of disclosure requirements. I mentioned the Franklin National Bank case. I mentioned this Court's decision in Rose. And I mentioned this regulation 7.4007, which the OCC just recently reaffirmed. So all of those say there is significant federal preemption of disclosure requirements. We also have, I think so. Let me make sure I understand what you're saying. I don't think you want to say this, but I want to give you a chance to make yourself clear. Are you saying that federal law allows a national bank to do high-to-low posting and to mislead the consumer as to what it is doing? Federal law prevents a state from preventing that. Let me try to be very clear, Your Honor. I think if a national bank were to say, we're going to do low-to-high posting, that's what they told their customers, and then they did high-to-low posting, I don't think they would be, I don't think there would be preemption there because, in effect, the bank has exercised its power under federal law. They've said, we're going to post low-to-high. And then they've gone and done something else. But if the claim is this disclosure was inadequate because you should have said more, you should have said it more clearly, the way I would urge you to think about it is if a state banking regulator passed a regulation saying national banks must have the following disclosures in connection with posting, that would be preempted because national banks are regulated by federal banking regulators. And so it can't be that if the state moves to say, okay, we won't have a specific banking code, we're going to have some very general laws, a very broad concept of fraud, the 17-200 concept, and through that mechanism, we're going to end up having some very specific requirements about, so that's. Well, it's not just a question of misleading. It's a question of the way it's calculated results in what the district court basically found to be an unfair impact on the consumer.  So then we're left with the question of even if you can do all these things and federal law permits you to do them, my question is at what point vis-a-vis the consumer does this federal preemption end and state law take over? And I think it is a question of how you frame it because it's easy to say those Supreme Court words because we all say those and we write them in every opinion that we have on conflict preemption. But in this case, it's a much more, I think it's a much trickier situation because if you're trying to figure out, well, what, is there anything preserved under the California unfair competition law or are you taking the position that with respect to calculation of overdraft that all of that basically is federally preempted? I mean, I would say that the federal regulators looked at this and in 2009, they made a specific decision not to change the traditional rule that banks may post in any order including high to low. That's at 74 Federal Register, 5548. And then more recently, and I think this is telling, federal regulators have taken action here. They've gone in a different direction. And this is a complex problem in the order of posting. If you think about it, it's just one aspect of people getting high overdraft fees for relatively small transactions. I mean, that happens sometimes when posting order doesn't even get into it. And so the federal regulators, this is 74 Federal Register, 59033, have amended a federal regulation, Regulation E, and they've gone to an opt-in approach. They still haven't changed posting order. High to low posting is still okay under federal law, but they've said, look, in general, to have any overdraft fees for debit card transactions, the customer is going to have to specifically opt into it with disclosures that are adequate under federal law and say, I understand, I'm getting a benefit in the sense that my transaction won't be turned down when I'm at the store, but I may get hit with significant fees if I overdraw my account. And so that's just a different approach to the problem. That's the one that the federal regulators have chosen. What if the real – what if we say that you can do all of that, whatever you want, but if you tell me that my transaction will be immediately, I shouldn't say credited, but deducted would be more accurate. And if your, meaning the bank, statement that there's this immediate deduction is false, why couldn't the State law address that issue? On the immediately, I mean, I do want to say about that, there were very limited uses of that term, and it didn't go on for a long period of time. The bank stopped it as soon as it realized that was not the best term to use. And there was no evidence in this case that anybody, not the named plaintiffs or anybody else, saw or relied on or was misled by those limited uses of immediately. The other evidence of fraud or misrepresentation, I mean, the main word was the use of automatically, which we think is quite different. I mean, you have to tell customers somehow that debit cards are different from credit cards, and with credit cards, you decide if you're going to pay your balance, and if not, you can carry a balance. With debit cards, of course, you don't, and so you don't want customers thinking, oh, well, I can decide at the end of the month whether I want to pay this. It's going to come out without further action from the customer. So we think that's a fair disclosure and, in fact, a necessary one. Well, I don't know whether you really think that's a fair disclosure. You got such a wave of complaints coming in from consumers that you were very early on alerted to the fact that the consumers did not understand what you were doing. So you might have thought, although I kind of doubt it, that your disclosure was sufficient to warn the consumers. You had almost immediate evidence that the consumers did not understand. Now, I understand your analysis of the word automatic, and I understand it, and I agree with it in an abstract fashion, but the evidence is the consumers didn't understand it, and you didn't tell them otherwise. Well, I mean, I think, again, Your Honor, I don't want to minimize any of this, but, I mean, yes, customers were hit with big overdraft fees. And they expressed considerable surprise. And but, I mean, again, posting order is just a part of this larger issue that the Federal regulators have chosen to address by having opt-ins. I mean, I think part of it was they maybe didn't understand that there would be overdrafts on debit cards at all. You know, they were not keeping close track of their accounts and had a bunch of overdrafts for small items in a short time. You know, there were disclosures that they maybe didn't read, and that's one of the things the district court said, well, this is a 60-page customer account agreement, this is unpaged. I mean, banking, most of these disclosures are required by Federal law, and if states are allowed to add additional ones, this agreement is going to be 300 pages long. The type size is adequate under Federal law and state law. And to say, well, because the customer didn't read and understand everything in there, then at that point it's fraud. I mean, there may be a very real issue that customers don't fully understand what's going to happen to them, and so they get very unhappy when bad things happen. But the Federal ‑‑ as I say, the Federal regulators have been looking at this. They actually said when they adopted the opt-in approach, they said, we're going to continue to monitor posting order. We're continuing to look at it. So we're ‑‑ Our questions have taken you over your time. Yes. So we thank you, but we will give you some time for rebuttal. Thank you, Your Honor. We'll equalize the time. Why don't you put 30 minutes on the clock?  Good morning. May it please the Court, I am Michael Sobel, and I represent plaintiff class representatives Veronica Gutierrez, Aaron Walker, and the certified class of over 1 million California customers of Wells Fargo Bank that incurred unfairly overdraft fees as a result of Wells Fargo's practice of reordering debit card transactions from their naturally occurring chronological sequence into a high-to-low order. Wells Fargo's specific incarnation of the high-to-low posting practice, which does deplete count balances as fast as mathematically possible, was engineered in combination with other allied practices designed to ensure the assessment of additional overdraft fees by accentuating the impact of high-to-low posting. These practices were hidden from consumers through a facade of misleading information, not only in the account agreement but in promotional materials, in their online banking displays, in Internet presentations. And they were meant to leave the impression that debit card transactions would be deducted in the order that the transaction took place. And not collected at the end of the day or the next day, and then reordered high-to-low for the sole purpose of generating overdraft fees. The evidence at trial overwhelmingly established that Wells Fargo's use of this internal bookkeeping device, which could take a single overdraft fee and turn it into as many as 10, was in bad faith. The example counsel uses of a breach of contract claim, suppose they represented low-to-high and they did high-to-low. This is exactly the kind of situation we have here. What Judge Alsup found was that there was a wide array of broadly disseminated representations meant and designed to leave the consumers with the impression that using a debit card was, in fact, just like cash. Don't think of it as a credit card. Wells Fargo's witnesses testified in deposition and at trial that, in fact, that was the intent behind these specific representations, to make sure that customers actually didn't understand the practice but thought that this was just like using cash. It is true that once Mr. McCune took the deposition of one of the executives of Wells Fargo Bank and pointed out their use of the word immediately, that during the course of the litigation they dropped that. But these representations were broad and actually relied on by the class representatives. Judge Alsup found that the welcome jacket, which ordinarily customers get when they open up their account, had some of these representations of automatically. He equated automatically with immediately, given the overall scheme of the marketing and the intent behind the representations. And he said that Erin Walker actually relied on those and that she incurred overdraft fees because she was misled. And the same with Ms. Gutierrez, who saw the promotional materials of the checking, savings, and more, who was confused by her monthly account statement, who didn't understand why her online pending debit transactions were posted chronologically, but she was incurring these overdraft fees. These practices, including the allied practice of the shadow line of credit, which the bank refrained from brandishing, was another one of these efforts to make customers believe that debit card transactions, you swipe the card, the money's gone, and it's deducted from your account at that moment. They intended for customers to have that understanding. This is actually a case of express deception. The OCC in its interpretive letters that we've referenced here, there's 916 and 997, and the OCC looks at, you know, the imposition of a good faith standard on a banking's discretionary authority to post Title O. And one of the, they first say, they set forth the California Commercial Code's, of course, you know, reference to imposing this good faith standard on posting transactions, a bank setting using its authority to post under the UCC. And it says, of course, that this is consistent. And that's really the only fair reading of the OCC's regulation or the interpretive letter. Which interpretive letter are you referring to now? That's interpretive letter 917 regarding the California Commercial Code. And there's also another one which is quite similar because Texas, their commercial code under the UCC section 403, their adoption of the UCC 403, contains a similar good faith requirement that the OCC has essentially said is consistent. Now, there's one court that's already made this conclusion, and that's the White v. Wachovia case, Judge Martin and the Northern District, who evaluating the Georgia UCL and a claim, just like the claim here, that the reordering of debit card transactions for the purpose of generating overdraft fees is not preempted, in part because the OCC has said that such a good faith standard on this discretionary authority is consistent. If it's consistent, it can't conflict. The OCC in this interpretive letter says, well, what's a relevant factor in determining bad faith? And it says, well, one of the relevant factors in determining bad faith would be, are the bank's representations inconsistent with its actual practices? Here they are. The bank's representations were meant to mislead consumers because they did not want consumers playing afloat. They didn't want consumers believing that they could use their debit card, make transactions when they didn't have enough money, run in the next day, put in credits. They wanted to avoid all that. They wanted to not have the consumers treat it like a credit card. And so they came up with this idea of making them think it was cash. This misled them. Now, the disclosure inside the account agreement was vague, insufficient to really communicate to customers what the posting practices would be or what their impact on fees would be. And in fact, that's what Judge Alsup concluded, that part of this deception, part of this overall bad faith was, in fact, a plan to stick the supposed disclosure of the posting order deep within a 60-page, single-space, ten-point font agreement that nobody reads, that Wells Fargo's own witnesses said nobody reads. And therefore, Judge Alsup concluded this disclosure was designed to go unnoticed. Let's assume that it's read, whether actually read or not, and let's assume that the consumer is chargeable with having read it because it's there and it's clearly in the fine print. Everybody knows you're going to get hit with the fine print, and if you don't read it, you don't understand it, too bad. Okay, let's assume that that's so. Judge Alsup reads that language, the bank may, as misleading because it's not a question of may in reality, but rather the bank has already done it. Is that deceptive? Because the bank may change it back, obviously it didn't want to, and absent lawsuit and compulsion doesn't seem to have been willing to do so, but why is may a fatally misleading term? It doesn't communicate anything. Well, it communicates quite a bit. It says I can do it, and I might. Well, what Judge Alsup determined after reading that language is that someone could look at that and say, wow, the bank may do this. Well, I'm glad they're not doing that to me. And that, therefore, it communicated to someone that maybe they were actually engaging in a practice that was not that practice, but something else. Why should the consumer assume that the bank is looking out for the consumer instead of the bank? I don't see why the consumer there – I don't think the consumer would think that the bank is looking out for it. But even if the consumer were to read that section, what Wells Fargo's own expert testified to was that no reasonable depositor could understand what it means. Well, then that would suggest that no disclosures – I mean, most depositors don't understand high to low and automatic transactions and all that. So that argument seemed to me doesn't get you anywhere. We had this point in trial, Your Honor. It was very illuminating on that subject because there were people who the rare consumer who complains loudly enough gets the attention of the bank and gets a form letter back. And we introduced that form letter into the record. And that form letter disclosed that when the bank wants to, it can communicate in fairly clear and concise terms a sufficient description of how the posting practice works. Because that's what these letters would do if people complained loudly enough. But this was not what was in the account agreement. But the account agreement was what Judge Alsop called vaguely worded mumbo jumbo because you can't possibly reasonably interpret – a reasonable consumer could not understand what they actually did tell them. But they were capable of it. This is why he – not only did he say it was designed to go unnoticed, it was designed to mislead, not really communicate. The shadow line practices weren't disclosed at all. The idea that debit cards were, in fact, quite the opposite of cash, but actually had this little line of credit behind it that could put you in overdraft status, it's not something that the consumers knew. And that was because the bank was setting up a trap, a trap. But you could have the same language in Nevada. And Wells Fargo – Mills Fargo could well be saying, look, we want to preserve our right to go high to low in Nevada. Our position is Nevada law doesn't control. So that's not misleading. You could have the same language in Nevada. It wouldn't make any difference. I guess it gets back to Judge Fletcher's question. Why is May misleading? I think May, in the context of the rest of the statement, that it really doesn't describe how it is that the bank is actually performing their practices. That's what would be meaningful to a consumer. And it doesn't explain what high to low means. It doesn't put it in context of other transactions, credits, debits and things. And it doesn't communicate enough information. It looks more like a lawyer's paragraph in order to, you know, claim some sort of defense later. So even if the agreement said the bank will, you would take the same position? In fact, that was the position taken by witnesses at the bank at trial. And that was quite revealing because even the reference to high to low within the agreement itself isn't sufficiently described the high to low practice. This was revealed when we asked Ken Zimmerman, the head of the consumer deposit group, suppose the agreement where it says may post high to low says shall post high to low. His answer was, oh, no, we can't do that. That would be inaccurate. Well, if saying shall post high to low would be inaccurate, certainly saying may post high to low doesn't communicate enough information either. And it seems to me that, you know, you know. I'm sorry. I didn't. Why is shall post high to low inaccurate? He didn't elucidate at trial. But I think his notion was that if you were going to talk about what you were actually doing, that just saying high to low was not going to be enough. Well, I didn't read it that way. I mean, if you don't, if they don't always do that, then, of course, that would be false. But the may permits you to yes, do it, no, do it, depending. So, I mean, it's hard to read in the interpretation you're giving it. Because when I read that, I thought it's like kind of a wash. Well, in the context of the trial when he answered that shall would be inaccurate, I think the premise of the question was if you were indeed engaging in that practice and it said shall. He was uncomfortable with even that because the agreement would not have set forth sufficiently the amount of information. But inaccurate is different from incomplete. Maybe he meant incomplete. Setting accurate. Yeah, yeah. Is this question as to whether or not the disclosures were misleading, inaccurate, fraudulent or whatever, is it a question of fact? It certainly is a question of fact. I mean, you know. I'm trying to figure out our standard of review. Where I'm headed is obvious, I guess. Yeah, well, you know, to the extent that a preemption determination relies on a fact-induced trial, I think you look at that finding of fact for clear error. Once you reach your questions of law, you look at them de novo. But, you know, Wells Fargo has this argument that somehow the covenant of good faith and fair dealing can't apply here because of what's in the agreement, that somehow the agreement expressly provides for this. But the other thing that the witnesses testified at trial was that Wells Fargo made a conscious decision not to specify the actual posting order. This is something they declined to do. And it seems to me they can't avoid the application of the covenant of good faith, fair dealing, and claiming that the account agreement expressly provides for something when their own witnesses at trial say, no, we tried not to put it in there. There's a, you know, the conflict preemption, it seems to me, is pretty straightforward here. The OCC has come forward, and we are talking about a banking power, talking about the exercise of a discretionary banking power. The regulation 7.4002, which sets forth this fee authority, we do the analysis both before and after the Dodd-Frank Act under the Barnett case, right? So it's conflict preemption. This Court a couple of years ago in Martinez noted that the OCC, in fact, has cautioned banks that you, you know, beware, you might be subject to the California UCL and other such laws that prohibit unfair practices like this. So, you know, this is exactly the kind of case, and I think the Court correctly below ruled that the fraudulent and deceptive prong was indeed violated. And if you're... And, of course, in Martinez, there's reference to that, but then they basically go on in there and don't they say that the OCC regulation governs? I mean, it is preempted, right? Well, you know, here Plaintiff's claim... So what do they say in Martinez? Let's answer the question before going on with...  Right. So the claim in Martinez was preempted. Right. But the claim in Martinez was not the kind of claim that was here. Well, but somehow you're suggesting that Martinez provides the answer to your prayers on preemption, and I'm just suggesting that if you look at the language in there, in fact, it was the force of the OCC regulation that was the foundation for the preemption, right? So here the question is why isn't the authority to go high to low, the authority to calculate fees and the various other OCC regulations parallel to the Martinez situation? Well, there are limits to that authority. And here the limits to fee-setting authority have been acknowledged by the OCC itself. In interpretive letters interpreting 4002 as being subject to a good-faith standard, there was no good-faith claim in Martinez. Here Plaintiff's claims are the kinds of claims that are traditionally not preempted, right? You have a bank. Well, there was an unfair competition claim. There was an unfair competition claim, but it was not based on a good-faith standard, and the good-faith standard that the OCC has recognized in its interpretive letters as being consistent with its own authority was not at issue. Well, they allege that Wells Fargo is engaged in fraudulent practices by failing to disclose actual costs of the underwriting of tax services. It's a disclosure issue, good faith, UCL. I mean, it's pretty close. But here we have an express statement by the OCC with respect to a good-faith standard in the California Commercial Code, which Judge Alsup used to tether the UCL claim. The UCL claim has an unfair prong. It has a fraudulent and deceptive business prong. Both prongs are independent claims. Judge Alsup tethered the unfair claim to the California Commercial Code, not existent in Martinez, and that specific comment in the California Commercial Code is the very same one that the OCC has said is consistent with their authority. And plaintiff's claims here are the kinds that really aren't traditionally preempted, where the bank exercises its federal authority but remains liable when it breaches a standard under a promise or a contract, or when it's dishonest about how it's going to execute that discretionary authority. Those were not at issue in Martinez. Additionally, outside of the conflict preemption standard, the judge below found a separate and independent basis to reject preemption, which I'd like to address briefly, outside of conflict preemption. Although Wells Fargo bases its preemption defense on this authority under 4002, what revealed itself at trial, though not in the decisions twice before trial rejecting preemption on the papers, but what came out at trial was that Wells Fargo was not acting pursuant to its authority under 4002. Well, if it's not acting pursuant to its authority under 4002, it can't invoke 4002 as a basis for preemption. The OCC explains that when operating pursuant to an authority under 4002, a bank must consider four factors. It's when they consider these four factors under 4002 that they're operating under their authority to set fees. Judge Alsop concluded that Wells Fargo never considered these four factors, ever. There was a complete absence in the record of any documentary evidence, contemporaneous documents. Let me just ask you about that. I wondered if that was actually appropriate preemption analysis. In other words, whether a State court should be looking at whether if there's preemption, there's preemption, and that it's a Federal question of whether it's consistent with appropriate safe banking practices, which the Federal regulators would step in if they or potentially could step in. But it seems to me that the — it's a little odd to say the State court made a determination that you're not living up to that Federal obligation and, therefore, there's no preemption. So I — do you have any other case where the factors within the Federal — Federally designated preemption became a factor in the State court? No, Your Honor, not like that. But I think what we have here is — I mean, what — don't you think it's a little odd to be basing a preemption, even if it's an alternative preemption analysis, on that kind of determination? I mean, what is their legal basis for looking at preemption that way? I suppose facts are facts, and that's what outed at trial, Your Honor. And facts do double duty sometimes. Let's be clear. There's nothing in Judge Alsop's decision that said the bank did not engage in safe and sound banking practices, or it did engage in safe and sound banking practices. That's the purview of the OCC. This Court's made that clear in other cases. But it seems odd that a bank would come to court, assert a preemption defense, and say, we're acting pursuant to this section, and we operated in good faith under this section and setting fees. And then there's a question of evidence. Where's the evidence of that good faith? Where's the evidence that you were operating under this section? There are four factors listed under this section. The OCC says you've got to consider these four factors if you're setting fees under this section. So maybe if you can show me that proof, we can find out whether or not you were really acting in good faith. Well, whether you're acting in good faith or not is not contingent on compliance with the OCC regulations. And compliance is right out the window. It's not a matter of compliance. It's a matter of fact. It's a factual determination. It's a factual determination where they even considered these factors, when the weight of the evidence was completely opposite. They had none of those factors in mind at all. There were mountains of evidence about financial projections, how these allied practices would create lift in revenue for our overdraft business. But facts do double duty. The compliance issue is right out. It's a matter of fact. Here you are at trial and you're presented with this very potent evidence that the bank, the farthest thing on its mind was anything other than profiteering and gouging, as Judge Alsop put it. It was the profiteering and gouging that ran the decision. It had nothing to do with any of those considerations, any other legitimate reason. The judge found but one reason why the bank did it. There was no contemporaneous documents. I mean, if this wasn't a matter of regulatory compliance, like Wells Fargo asserts, surely given almost a year to roll out and plan and implement this practice, there would have been some contemporaneous documents. Yet they showed none. There wasn't any testimony that Judge Alsop found credible either. And the testimony wasn't credible because it was all speculative. Well, this is what we would have done. But when asked to have a specific recollection about discussing any of these factors after we cleared the courtroom for privacy, the answer was, I don't recall any. And everybody came back in. But there just was no evidence that they considered these factors. But why does that matter for preemption analysis? Well. I mean, in the sense of let's take a different, let's take a true conflict situation. We have a federal statute that says here's what you have to do. Let's say it's the four factors you have to consider. Can a court say, well, you didn't comply with federal law, and therefore state law takes precedence? It's not preemptive. I do not understand Your Honor's question. Well, we have these four factors that the OCC says you have to consider in terms of banking regulation for sound practices. Judge Alsop said, well, you didn't consider those factors. His conclusion was, well, that means it's not preemptive. And my question is, why does that mean it's not preemptive? If, in fact, we've imported those four factors into statute, can a court say, well, you didn't comply with federal law, therefore this action is not preemptive?  I don't know if that clarifies my question. It was an awkwardly worded question. It's not your fault. Well, I suppose this case presents a circumstance which I have to acknowledge I haven't seen before. But you had a trial here, and you had a trial about preemption facts. And if it matters to the preemption analysis, as opposed to being evidence of the bad faith or the, right, but if it matters to the preemption analysis, then it would have to matter in the following way, and that is, can a bank that has the burden to establish its preemption defense rely on a statute giving them a certain authority when they were not acting pursuant to that authority, when the judge found as a matter of fact that they were not acting pursuant to that authority? And that's what he ruled. That's what he said. I mean, he used it in his opinion. You'll see it. It wasn't a pricing decision. Don't tell me this was a pricing decision that affords you preemption. You didn't consider any of these factors. You had one thing in mind. So that's how it matters. And this is a sort of different situation than I've seen before, but it's a different situation, and it's independent of the conflict preemption. Right. I think my question more is, who gets to decide the authority question? And the OCC may well say, that's our call. It's not the State's call. I mean, if the bank is not exercising its authority pursuant to this guidance section, it's not a Federal issue, not a State issue. I think in some case where you had to evaluate maybe the qualitative nature of their consideration, you know, what did they take into account? Did they weigh factors right? You know, given what they knew, did they, you know, were they, was it a sham consideration? But here, it's just a void. It's just a void of it. So it seems here it's an easier call than it could be in some other hypothetical case where you had to evaluate. Whatever authority would it be acting, it might have been acting at odds with the authority, granted it. But its only ability to function as a national bank is really to function under the authority given to it through these Federal regulations. So I'm still having some trouble understanding whether we should look at the factual background. If we get past the preemption issue, then it seems to me all those points do go to the preemption issue. And I guess I'm still having some trouble understanding how that factual basis would really inform the legal question of preemption. Maybe there's just, you're suggesting this is a first time for everything. Well, as I mentioned, this is what came out at trial. And the conclusion of Judge Allison was not so much that they were acting contrary to that authority, because I think contrary would get into that other zone, potentially, where you're looking at to, you know, what's the OCC's role in determining this. But it wasn't that he found it as contrary. He found it just wasn't it at all. Have you ever been under the impression that the people in the trial, that they were engaging in a high-to-low practice, consulting third parties on how, what's the best way to do it? Let me ask you this, if I may. It's possible to read Judge Allsup's order or opinion as resting on two grounds, number one, basic deception. And the other is, whether deceptive or not, the high-low practice is simply not operating in good faith. The second part, it seems to me, for example, is made pretty clear in his injunctive order where he says, listen, you can't do high-low anymore. If we were to conclude, and I'm not sure even where I am on this point, that assuming proper disclosure, a bank could do high-low, but fraud or deception of the sort that we have here in this case, assuming we agree with Judge Allsup, is not preempted, how much of the damage judgment is sustainable? All of it. Because? Because each prong under the UCL would be entitled plaintiffs to the same amount of restitution pursuant to the formula that we presented at trial where we calculated each class member's damages individually, you know, and took their specifics of their account behavior into the formula, the common formula that we applied class-wide. So under either prong, the measure is the same.  Any further questions? No. Thank you for your argument. And I'll give you three minutes. On the question of the four factors that the bank was supposed to consider under 7.4002, this Court has actually already addressed that issue in the Martinez case that we were discussing earlier. And in footnote 8, the exact argument was made, and the Court rejected it, and said this argument doesn't support their position that the UCL claims are not preempted by the Act. Rather, it goes to whether Wells Fargo has abided by the OCC regulation. So exactly the point that your honors were making. On Judge Fletcher's question about why is May factually inaccurate, I mean, it's not just Nevada. I mean, the bank wants to have a uniform agreement, which is part of what Federal law gives it. Nevada, as we were talking, had a different order. But even in California at the time, it wouldn't be accurate because things weren't all posted at once, high to low. They were done in batches. First, credits were posted, which is very good for customers. That gives them the float. I guess my question wasn't really is it inaccurate. My question is it's misleading. I mean, one of the great skills of lawyers, and I'm not talking about any lawyer here or any lawyer in the courtroom, but one of the great skills of a lawyer is to say things that are accurate but misleading. Well, and I think the best way Judge McEwen said at one point, you know, well, you know, people, how do you get people to understand high to low? Maybe they're not understanding high to low. And I think we've established this morning it's not easy to understand this, even for three eminent judges, because it's very complex. And the fact is, even if you gave enough disclosure for ordinary consumers to actually figure out the posting order of a bank like Wells Fargo, which would be and I'm not even sure that's possible given human limitations, it still wouldn't resolve all of the problems with debit card overdrafts, because this issue of high to low is not the only issue. I mean, people are complaining. Before your time runs, I wanted to ask you one question coming out of Martinez. In Martinez, we held that a California fraud claim was preempted. And we did so based upon a regulation that was very explicit, because the regulation I'm just quoting now from the regulation that's quoted in Martinez, authorizes a bank to, quote, make real estate loans without regard to state law limitations concerning disclosure and advertising. Is there anything remotely so precise here that will protect the bank from making false and misleading disclosures? Yes. I mean, first, there were two regulations in Martinez, 7.4002, which is exactly the one we've been discussing. And the court said that was sufficient. And the 7.4007, it says that laws of these kinds concerning checking and disclosure are preempted, and the OCC just reaffirmed that in the Dodd-Frank regulations. So, again, the issue is, we think at the end of the day, who makes this choice? Is it a multiplicity of states, state courts, juries, who can make different choices, can decide that high-to-low posting is the issue, we need to beef up disclosures greatly on that? Or is it the Federal regulators having a single set of requirements for these national entities, national banks, and doing what they've in fact done in this case of let's address a broader set of problems by having an opt-in system? Thank you, counsel. Your time has expired. The case just argued will be submitted for decision. Thank you both for your arguments and your briefing. We realize we didn't get to all the issues we could have today, but the briefing has been very, very good. Thank you both, and we'll be in recess. Thank you.
judges: Thomas, McKeown, Fletcher